UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Brian Lee Marlowe,                                  Civil File No. 09-CV-3327 (JRT/AJB)

        Plaintiff,

    vs.

Joan Fabian, individually and in her          **MEMORANDUM SUPPORTING**
official capacity as Commissioner of          **DEFENDANTS' MOTION FOR**
the   Minnesota   Department   of             **SUMMARY JUDGMENT**
Corrections;  and  Jeffrey  Peterson,
individually   and   in   his   official
capacity  as  Executive  Officer  of  the
Minnesota Department of Corrections
Hearings and Release Unit,

        Defendants.


Plaintiff Brian Marlowe alleges that Defendants Joan Fabian and Jeffrey Peterson violated his federal and state constitutional rights, and falsely imprisoned him by revoking his supervised release.  Residing in an approved residence was a condition of Marlowe's release.  Marlowe, a level-II predatory offender, did not have approved housing.  The Minnesota Department of Corrections (DOC) subsequently revoked Marlowe's release and reincarcerated him until he secured approved housing.  Because Marlowe cannot obtain any of the relief requested in his complaint and he cannot establish that either defendant committed any constitutional violation or tort, the defendants respectfully request that the Court enter summary judgment in their favor.

## FACTS

Marlowe is serving a sentence for first-degree criminal sexual conduct. Affidavit of Krista Guinn Fink ¶ 2. Marlowe pleaded guilty to repeatedly sexually assaulting his seven-year-old daughter. *Id.*, Ex. 1. Marlowe was convicted in Washington County, Minnesota, and entered the DOC's custody in July 2002. *Id.* ¶¶ 2–3, Ex. 1. His sentence expires in December 2012. *Id.* ¶ 3. In addition to explaining Marlowe's specific involvement with the DOC, addressing the claims in this lawsuit requires an overview of Minnesota's supervised-release program; release planning and housing for offenders; the role of the state and counties in supervising offenders in the community; and the DOC's institutional organization.

### *Intensive Supervised Release*

In Minnesota, an executed prison sentence generally comprises a term of imprisonment followed by supervised release, also known as parole, in the community. Minn. Stat. § 244.05, subd. 1b (2008). The term of imprisonment is equal to two-thirds of the offender's sentence, unless he receives extended incarceration for prison disciplinary violations. *Id.* § 244.101, subd. 1 (2008). The date on which an offender completes his term of imprisonment is a supervised release date (SRD). Affidavit of Jeffrey Peterson ¶ 2.

On an offender's SRD, he is released from prison on either supervised release or intensive supervised release (ISR). Peterson Aff. ¶ 2; Affidavit of Christine Bray ¶ 4. The DOC may place offenders on ISR when ISR would promote public safety or the offender has been convicted of first-degree criminal sexual conduct. Minn.

Stat. §§ 244.05, subd. 6(a), .14, subd. 1(2) (2008).   As its name suggests, ISR is a more intensive form of supervision provided to higher-risk offenders.   Affidavit of Jill Carlson ¶¶ 9–10, Ex. 1–2; Deposition of Jeffrey Peterson Tr. 11 (attached as Exhibit 2 to Affidavit of Angela Behrens).   The DOC has broad discretion to impose release conditions.   Minn. Stat. § 244.05, subd. 6(b) (2008).   Violating a condition may result in revocation of release and reincarceration.   *Id.*, subd. 3(2) (2008); Peterson Aff. ¶ 3.

ISR agents, who supervise ISR offenders, have a broad range of duties.   Among their duties are: having frequent face-to-face contacts at offenders' homes and workplaces; remaining in telephone contact with offenders; contacting local law enforcement or other community resources; conducting drug and alcohol testing; implementing release conditions, such as electronic home monitoring; documenting all interactions with or about offenders; participating in revocation hearings when necessary; assisting inmates with release planning; and transporting newly released offenders from prison to their new residences.   Carlson Aff. ¶¶ 9–10; Affidavit of Jason Terwey ¶ 2. Because DOC ISR agents cover broad territories rather than specific counties, agents must also travel a lot.   Carlson Aff. ¶ 11.   Agent caseloads are limited by statute.   *Id.*; *see also* Minn. Stat. § 244.13, subd. 2 (2008).

Accounting for extended incarceration Marlowe received, his SRD was December 6, 2007.   Guinn Fink Aff. ¶ 3; Deposition of Brian Marlowe Tr. 16 (attached as Exhibit 1 to Behrens Aff.).   Before his SRD, the DOC's end-of-confinement-review committee designated Marlowe a risk-level-II predatory offender.   Guinn Fink Aff. ¶ 4; *see also* Minn. Stat. § 244.052, subd. 3 (requiring committee to assess public-safety risk).

3

A level-II offender has a moderate risk of reoffense.  Minn. Stat. § 244.052, subd. 3(e).

The DOC places level-II offenders on ISR.  Affidavit of Mariann Ruben ¶ 5, Ex. 1.

***Release Planning and Housing for Offenders on ISR***

Every offender on parole, regardless of whether he is on supervised release or ISR,

must reside at an approved residence.  Peterson Aff. ¶ 9.  A housing requirement

promotes public safety and enables effective supervision.  Carlson Aff. ¶ 4  An offender

is ultimately responsible for finding his own housing.  *Id.* ¶ 7.  The DOC releases about

5,000 offenders a year; most successfully locate housing.  Bray Aff. ¶ 7.

An offender generally may live anywhere in the state if he has an approved

permanent residence.  Carlson Aff. ¶ 6.  Transitional housing, such as a motel or a

halfway house, is not considered a permanent residence.  *Id.*  The DOC's case-

management policy outlines the process for assisting offenders who are approaching their

SRD.  DOC Policy 203.010 (attached as Ruben Aff. ¶ 5, Ex. 1).  The policy lists

hierarchical criteria to determine where an offender should live.  *Id.* § C.2.d.  The criteria

are guided by determining where an offender is most likely to succeed.  Bray Aff. ¶ 10.

When an offender cannot locate a residence and is homeless, the default location is

generally the county that committed the offender to the DOC's custody.  DOC

Policy 203.010, § C.2.d.  The county of commitment is considered the responsible county

and is the place where the offender will most likely be able to receive social services or

other forms of public assistance.  Bray Aff. ¶ 10; Carlson Aff. ¶ 8.

In general, the offender, his case manager, and his supervising agent work

independently and collaboratively to develop a release plan.  Ruben Aff. ¶ 7; Bray

Aff. ¶ 5.   The release plan includes the offender's conditions of release, the location where he will live, and a decision as to who will supervise the offender.   Ruben Aff. ¶ 8. When a case manager or offender finds an address that appears to be a viable option, the case manager submits a form to the jurisdiction that supervises offenders in the county of the proposed residence**.**   *Id.*   The agent then investigates the residence, considers whether special conditions should be part of the offender's conditions of release, and approves or rejects the residence.   *Id.*

After the case manager and agent formulate the release plan, a program review team (PRT) at the offender's correctional facility reviews the plan.   Peterson Dep. Tr. 8-9, 16–17.   The plan then goes to the DOC's Hearings and Release Unit (HRU), where a staff member reviews the plan to determine whether DOC criteria were appropriately applied for placement on ISR or regular supervised release and whether the plan includes appropriate conditions.   *Id.*   Because the housing decision has already been through two levels of review at that point, HRU staff do not review or reinvestigate housing decisions.   *Id.*; Peterson Aff. ¶ 9.   The HRU's focus is on whether the plan includes proper conditions rather than on implementation of those conditions.   Peterson Aff. ¶ 9.

### *Supervising Jurisdictions*

In addition to having a place to live, an offender must have supervision. Minnesota has several delivery systems for supervising offenders in the community. Bray Aff. ¶ 13.   The Community Corrections Act (CCA) permits counties to provide correctional supervision to offenders on supervised release or ISR.   Minn. Stat. ch. 401

(2008).  Twelve of Minnesota's eighty-seven counties are CCA counties that provide ISR supervision.  Bray Aff. ¶ 13.  When an ISR offender resides in a CCA county, the county supervises the offender.  *Id.*  The DOC supervises ISR offenders who reside in Minnesota's other seventy-five counties.  *Id.*  CCA counties receive legislative funding specifically for the supervision services they provide; the DOC does not have the authority to place conditions on the funds or to redirect funding.  Bray Aff. ¶ 14; Affidavit of Harley Nelson Aff. ¶ 3.

The counties in which the DOC supervises ISR are divided into multi-county districts.  Carlson Aff. ¶ 11, Ex. 3.  DOC agents do not have the personnel or financial resources to supervise ISR offenders in CCA counties.  *Id.* ¶ 14; Nelson Aff. ¶ 4.  The ISR-supervision structure also serves public safety because ISR agents become familiar with the specific territory in which they supervise.  Carlson Aff. ¶ 14.  Agents are therefore more familiar with resources for offenders, and are able to better supervise by becoming familiar with the area and with local law enforcement.  *Id.*

Supervision issues arise when an offender seeks to live in transitional housing in a CCA county, but has no permanent residence in the county.  Carlson Aff. ¶ 8; Ruben Aff. ¶ 6; Affidavit of Sarah Tardy ¶ 9.  The counties do not wish to expend resources supervising an offender who is unlikely to remain in the county when the county is not the offender's county of commitment.  Carlson Aff. ¶ 8.  Ramsey and Hennepin Counties have been particularly reluctant to supervise these offenders because accepting all of the state's homeless ISR offenders provides no incentive for other counties to develop comparable transitional housing.  Tardy Aff. ¶¶ 9, 16, Ex. 1 at 9–10.

If an offender has a viable release plan with a permanent residence in a CCA county, and the county refuses supervision, the DOC has a dispute-resolution process for determining the supervising jurisdiction.   Nelson Aff. ¶ 6; Peterson Dep. Tr. 18-19, 35-37.   This process is ultimately guided by the Deputy Commissioner of Community Services, who will make a decision if no resolution is reached as the dispute works its way up the chain of command of both parties to the dispute.   Nelson Aff. ¶ 6; Peterson Dep. Tr. 19.   The HRU is not part of the DOC's Community Services Division.[1]   Bray Aff. ¶ 2; Peterson Aff. ¶ 8.

### Marlowe's Release

Before Marlowe's SRD, he did not locate a permanent residence.   Ruben Aff. ¶ 15.   Perhaps unsurprisingly, many renters and landlords are reluctant to assist offenders, particularly level-II predatory offenders and particularly offenders convicted of sexually assaulting minors.   Bray Aff. ¶ 8; Ruben Aff. ¶ 7; Marlowe Dep. Tr. 19–21, 32. The residences that Marlowe, his case manager, and his supervising agent investigated did not work out for a variety of reasons:   many potential landlords did not return Marlowe's calls or hung up when they heard that the telephone call was coming from a correctional facility; many places would not accept a level-II sex offender, or a sex offender whose victim was a minor; Marlowe's aunt lived across the street from an

---

[1] The HRU is part of the DOC's Policy and Legal Services Division.   Peterson Aff. ¶ 8. Among the HRU's functions are conducting administrative hearings for the DOC, reviewing offender release plans, reviewing juvenile-parole cases, issuing warrants for the DOC, and facilitating life-sentence reviews.   Peterson Dep. Tr. 6.   The DOC's Community Services Division includes Field Services, which is the area of the DOC that includes corrections agents who supervise offenders on supervised release.   Peterson Aff. ¶ 8; Bray Aff. ¶ 2.

elementary school and other family members were not willing to provide him with housing; and others simply said no.   Ruben Aff. ¶ 13, Ex. 1; Terwey Aff. ¶¶ 7–9; Marlowe Dep. Tr. 20–21.   Although RS Eden, a halfway house in St. Paul, indicated it could provide transitional housing for Marlowe, Ramsey County would not accept supervision of Marlowe because he had no recent residential history or permanent residence in the county .  Ruben Aff. ¶¶ 12, 14.

On Marlowe's SRD, December 6, 2007, Marlowe's supervising agent picked him up from the prison.  Terwey Aff. ¶ 8.  The agent allowed Marlowe to use a telephone and newspaper to continue to look for housing.  *Id.*  Because Marlowe could not find a place to live, the agent eventually transported Marlowe to the Washington County jail.  *Id.* Marlowe made few efforts to secure housing while he was in jail.   Marlowe Dep. Tr. 32-36; Terwey Aff. ¶ 10.   On December 18, a DOC hearing officer conducted a revocation hearing.  Peterson Aff. ¶ 5.  Because Marlowe was not residing in approved housing, the hearing officer revoked Marlowe's release.   *Id.*, Ex. 2.   Marlowe's administrative appeal of the decision was unsuccessful.   *Id.*   Marlowe was then reincarcerated at the Minnesota Correctional Facility in Lino Lakes (MCF–LL).  Guinn Fink Aff. ¶ 3, Ex. 2.

After the DOC revoked his release, the DOC continued to help Marlowe find housing, and he could have been released at any time he located approved housing. Tardy Aff. ¶¶ 6–7, 9–17, Ex. 1–2; Peterson Aff. ¶¶ 5–6, Ex. 2–3.  During Marlowe's post-revocation housing search, he encountered obstacles similar to those in his previous

housing search.   Tardy Aff. ¶ 7.   Marlowe acknowledged the significant efforts his case manager made to assist him.   *Id.*, Ex. 1 at 85; Marlowe Dep. Tr. 69–70.

### State Habeas Proceedings

In February 2008, Marlowe petitioned a Minnesota district court for a writ of habeas corpus, alleging that he was never released on his SRD, and that transporting him to the county jail and later revoking his release violated his right to due process.   Guinn Fink Aff. ¶ 5, Ex. 3.   The district court denied the petition.   *Id.*, Ex. 4.   In September 2008, the Minnesota Court of Appeals reversed and remanded, directing the DOC only to "*consider* restructuring [the offender's] release plan and . . . seek to develop a plan that can achieve [the offender's] release from prison and placement in a suitable and approved residence."   *State ex rel. Marlowe v. Fabian*, 755 N.W.2d 792, 797 (Minn. Ct. App. 2008) (emphasis added).   The court did not hold that the DOC violated Marlowe's right to due process or that Marlowe was unlawfully incarcerated.   *Id.* at 794-96 & nn.1-2.   Nor did the court grant Marlowe's habeas writ or order the DOC to release Marlowe.   *Id.* at 797.

### Post-Habeas Release

Throughout Marlowe's habeas proceedings, the DOC continued to help Marlowe look for housing.   Tardy Aff. ¶ 14.   On September 23, 2008, RS Eden placed Marlowe on its waiting list, but anticipated that the bed would not be available until December 16, 2008.   *Id.*   Marlowe informed the state district court and the DOC that, given this development, further district court proceedings were unnecessary in his habeas case. Guinn Fink Aff. ¶ 6, Ex. 4.   The DOC's Deputy Commissioner of Community Services

met with Ramsey County Community Corrections staff, and although Marlowe would not ordinarily be eligible for the placement, the agencies agreed that Ramsey County would supervise Marlowe while he resided at RS Eden.  Nelson Aff. ¶ 7, Ex. 1.

On December 16, 2008, Marlowe was released to RS Eden.  Guinn Fink Aff. ¶ 15. After multiple violations of his conditions of release, Marlowe was reimprisoned from June 18, 2010 to November 1, 2010.  Peterson Aff. ¶ 7, Ex. 4.  These violations were unrelated to the housing issues raised in this lawsuit.  *Id.*  In November 2009, Marlowe commenced this litigation, alleging that the DOC violated the Fourth, Fifth, Eighth, and Fourteenth Amendments of the U.S. Constitution, and their counterparts in the Minnesota Constitution, and also falsely imprisoned him for 375 days.[2]  Compl.  (Doc. No. 1).

## ARGUMENT

Summary judgment is appropriate when no genuine issues of material fact exist and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); *Tucker v. Evans*, 276 F.3d 999, 1001 (8th. Cir. 2002).  The moving party bears the initial burden of stating the grounds for its motion and identifying the portions of the record that demonstrate the lack of any genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The nonmoving party must then set forth specific facts, on every essential element for which he bears the burden of proof, to show that a genuine issue for trial exists.  *Smith v. Tandy*, 897 F.2d 355, 356 (8th Cir. 1990).  Only factual disputes that might affect a case's outcome are material and may properly preclude summary judgment.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986).  If

---

[2] The 375 days appears to count from December 6, 2007 to December 15, 2008.

the nonmoving party fails to meet his burden of production, the court may enter summary judgment for the moving party.   Fed. R. Civ. P. 56(e)(2).

I.    **THE ELEVENTH AMENDMENT AND SECTION 1983 BAR MARLOWE'S DAMAGES CLAIMS AGAINST THE STATE.**

Marlowe sued the defendants in their official capacities and seeks damages. Compl. 1, 8.   An official-capacity claim against a government employee is a claim against the state.   *Kentucky v. Graham*, 473 U.S. 159, 165–66 (1985).   Neither the Eleventh Amendment nor Section 1983 permit Marlowe's claims against the state for damages.

It is well established that the Eleventh Amendment prohibits damages claims against a state in federal court unless either Congress abrogated the state's immunity or the state consented to suit.   *Id.* at 169; *Hans v. Louisiana*, 134 U.S. 1 (1890).   Congress has not abrogated state immunity to Section 1983 claims and Minnesota has not consented to suit.   Although Minnesota has waived some immunity to tort claims in state court, the state has not waived immunity to damages claims in federal courts.   *DeGidio v. Perpich*, 612 F. Supp. 1383, 1389 (D. Minn. 1985); *see also Semler v. Finch*, No. 07-4252, 2008 WL 4151825, *4 (D. Minn. Sept. 3, 2008).   Because Marlowe seeks damages from the state and the Eleventh Amendment bars these claims, the Court should dismiss the claims.

Further, Section 1983 permits suits only against a "person."   42 U.S.C. § 1983 (2006).   A state is not a person for purposes of a Section 1983 damages claim.   *Will v.*

*Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989).  Marlowe therefore cannot maintain Section 1983 claims for damages against the state.

## II.   THE *HECK* DOCTRINE BARS MARLOWE'S DAMAGES CLAIMS BECAUSE HE DID NOT FIRST ESTABLISH UNLAWFUL INCARCERATION THROUGH A HABEAS ACTION.

Marlowe's claims for damages are also barred because he seeks damages for allegedly unlawful incarceration, but he did not first establish in a habeas action that the DOC unlawfully incarcerated him.  An offender may bring a damages claim predicated on allegedly unlawful imprisonment only in limited circumstances.  If a Section 1983 damages claim necessarily implies the invalidity of the fact or length of an offender's confinement, then the plaintiff must first succeed in a habeas proceeding.  *Heck v. Humphrey*, 512 U.S. 477, 486-87 (1994); *see also Edwards v. Balisok*, 520 U.S. 641, 648 (1997) (holding that essence of plaintiff's claim is determinative rather than relief sought).  This principle is commonly referred to as the favorable-termination rule.  To have a Section 1983 cause of action, the plaintiff must establish that the his incarceration has been "reversed, expunged, invalidated, or impugned by the grant of a writ of habeas corpus."  *Heck*, 512 U.S. at 489.  *Heck* remains a bar even when the plaintiff can no longer bring a habeas action.  *Entzi v. Redmann*, 485 F.3d 998, 1002–03 (8th Cir. 2007).

Although *Heck* directly addressed Section 1983 claims, courts have recognized that the *Heck* doctrine extends to any civil tort claim based on allegedly unlawful imprisonment because the rationale underlying *Heck* applies with equal force.  *See, e.g.*, *Munchinski v. Solomon*, Nos. 06-4093, 07-1343, 2007 WL 3121331, at *2 (3d Cir. 2007); *Erlin v. United States*, 364 F.3d 1127, 1131 (9th Cir. 2004); *Robinson v. Jones*,

142 F.3d 905, 902 (6th Cir. 1998); *Duffy v. Wolle*, 123 F.3d 1026, 1037 (8th Cir. 1997); *Parris v. United States*, 45 F.3d 383, 385 (10th Cir. 1995). The *Heck* doctrine prevents offenders from circumventing established procedures for challenging their confinement through a habeas action. *Heck*, 512 U.S. at 484–86. Allowing an offender to bring any tort claim seeking damages for unlawful incarceration would circumvent the appropriate habeas proceedings.

In this case, Marlowe seeks damages for 375 days of allegedly unlawful incarceration. Compl. ¶¶ 17, 40–42. To find that Marlowe is entitled to these damages would necessarily require a finding that the DOC unlawfully incarcerated Marlowe for 375 days. *Heck*'s favorable-termination rule therefore applies to his damages claims, but Marlowe's habeas proceedings did not establish unlawful incarceration. The state district court denied Marlowe's habeas petition. On appeal, the state court of appeals did not hold that Marlowe had been unlawfully incarcerated for 375 days. The court did not hold that the district court should have granted Marlowe's habeas petition, and no court ever granted Marlowe a writ of habeas corpus. Marlowe therefore cannot seek these damages in a civil lawsuit. The Court should therefore dismiss Marlowe's claims for damages.

## III.   MARLOWE'S CLAIM FOR DECLARATORY RELIEF IS MOOT.

Marlowe seeks a declaratory judgment that Fabian violated his constitutional rights. Requests for declaratory relief are moot when the plaintiff is no longer subject to the relevant conditions and the alleged wrong is not reasonably expected to be repeated against the plaintiff. *O'Shea v. Littleton*, 414 U.S. 488, 493–94 (1974) (requiring personal stake to maintain justiciable claim); *Smith v. Hundley*, 190 F.3d 852, 855

(8th Cir. 1999) (holding that transfer to different prison mooted request for declaratory relief). Courts do not assume plaintiffs will behave unlawfully in the future. *Weinstein v. Bradford*, 423 U.S. 147, 149 (1975) (holding that no demonstrated probability existed that plaintiff would be subject to challenged parole procedures in future); *O'Shea*, 414 U.S. at 497 (assuming plaintiffs would not violate law in future).

Marlowe is no longer subject to the circumstances that form the basis of his lawsuit and his request for declaratory relief is therefore moot. Marlowe left MCF–LL in December 2008. Marlowe's subsequent reincarceration was unrelated to the issues raised in his complaint. Absent a new criminal offense, Marlowe will never have a new SRD. And absent continued violations of the conditions of his supervised release and an inability to find housing in the future, the issues in this case will not arise again for Marlowe. The Court should therefore dismiss his claims for declaratory relief as moot.

## IV. THE MINNESOTA CONSTITUTION DOES NOT PROVIDE A PRIVATE CAUSE OF ACTION.

In addition to his federal constitutional claims, Marlowe alleges that the defendants violated the Minnesota Constitution. Compl. ¶¶ 29–37. Because the Minnesota Constitution does not provide a private cause of action, the Court should dismiss these claims.

The Minnesota Constitution does not provide a private cause of action. *Guite v. Wright*, 974 F. Supp. 866, 871 (D. Minn. 1997), *aff'd on other grounds*, 147 F.3d 747 (8th Cir. 1998); *Bird v. State*, 375 N.W.2d 36, 40 (Minn. Ct. App. 1985); *Danforth v. Eling*, No. A10-130, 2010 WL 4068791, at *6 (Minn. Ct. App. Oct. 19, 2010).

Minnesota does not have a Section 1983 equivalent to use as a vehicle to allege violations of the state constitution. *Mitchell v. Steffen*, 487 N.W.2d 869, 905 (Minn. Ct. App. 1992); *Bird*, 375 N.W.2d at 40. The Court should therefore dismiss Marlowe's claims alleging violations of the Minnesota Constitution.[3]

## V. MARLOWE CANNOT MAINTAIN CONSTITUTIONAL CLAIMS AGAINST THE DEFENDANTS IN THEIR INDIVIDUAL CAPACITIES.

Just as Marlowe cannot maintain claims against the state, he cannot maintain his individual-capacity Section 1983 claims against the defendants for damages. Neither defendant had sufficient personal involvement with Marlowe to impose individual liability. Further, even if Marlowe could establish personal involvement and a constitutional violation, qualified immunity bars his claims because he cannot establish any violation of a clearly established right.

### A. Neither Defendant Had Sufficient Personal Involvement To Impose Liability.

Individual liability for a Section 1983 violation requires direct personal involvement; the doctrine of respondeat superior does not apply. *Lenz v. Wade*, 490 F.3d 991, 995 (8th Cir. 2007). An individual may be held liable only if he directly participated in the constitutional violation, or, in failing to take corrective action, acted in a manner that was deliberately indifferent or exhibited tacit authorization of the unconstitutional practices. *Boyd v. Knox*, 47 F.3d 966, 968 (8th Cir. 1995); *Choate v. Lockhart*, 7 F.3d 1370, 1376 (8th Cir. 1993). Mere negligence in failing to detect or

---

[3] The state would also be immune to any damages claims under the Minnesota Constitution. *See Lund v. Comm'r of Pub. Safety*, 783 N.W.2d 142, 143 (Minn. 2010) (recognizing that Minnesota is immune sovereign).

prevent a subordinate's conduct is insufficient. *Ripson v. Alles*, 21 F.3d 805, 809 (8th Cir. 1994). A person must know about the conduct and facilitate it, approve it, condone it, or turn a blind eye. *Boyd,* 47 F.3d at 968; *Ripson,* 21 F.3d at 809. Neither a single incident nor a series of isolated incidents provides a sufficient basis for imposing liability. *Lenz*, 490 F.3d. at 996.

Neither of the defendants were personally involved with the actions that Marlowe asserts were unconstitutional. Marlowe's complaint alleges no specific facts concerning actions taken by either Fabian or Peterson. When deposed, Marlowe admitted that he sued these two defendants based on their job titles. Marlowe Dep. Tr. 71–72. Marlowe's complaint concerns his incarceration based on the lack of an approved residence. The DOC's community-services division investigates offender housing placements and either approves or rejects those placements. Disputes concerning supervising jurisdictions are addressed through the DOC's community-services division. Neither Fabian nor Peterson is directly involved with these functions of the DOC. Behrens Aff. ¶ 5, Ex. 4; Peterson Dep. Tr. 14–15, 18–19. Because Marlowe cannot establish personal involvement by either defendant, the Court should dismiss Marlowe's individual-capacity claims.

> **B.    Qualified Immunity Bars Marlowe's Individual-Capacity Claims Because He Cannot Establish That Either Defendant Violated A Clearly Established Right.**

Even if Marlowe could establish personal involvement, qualified immunity bars his individual-capacity claims for damages. Government officers are not personally liable for civil damages unless their actions violate a clearly established right. *Hope v. Pelzer*, 536 U.S. 730, 739 (2002). A qualified-immunity analysis has two components:

16

whether a government officer violated the plaintiff's rights and whether the right was clearly established. *Pearson v. Callahan*, 129 S. Ct. 808, 815–16 (2009). Courts may address either component first when presented with a qualified-immunity defense. *Id.* at 818. If the claimed violation would not be of a clearly established right, the court need not address whether the plaintiff can establish an actual constitutional violation. *Id.*

Even if Marlowe could establish that either defendant violated a constitutional right, qualified immunity bars personal liability because he cannot establish violation of a clearly established right. "Clearly established" means that the unlawfulness was apparent in light of the pre-existing law. *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). Officers must be on notice that their conduct is unlawful. *Hope*, 536 U.S. at 739. Qualified immunity provides "ample protection to all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986). Qualified immunity is determined using an objective standard. *Davis v. Scherer*, 468 U.S. 183, 190 (1984). The inquiry is based on the specific facts of a case, rather than broad propositions of law. *Serna v. Goodno*, 567 F.3d 944, 952 (8th Cir. 2009).

Marlowe cannot establish any violation of a clearly established right. Minnesota offenders have a liberty interest in their SRD and the date cannot be extended absent procedural due process. *Carrillo v. Fabian*, 701 N.W.2d 763, 772 (Minn. 2005). Similarly, offenders have a right to due process before parole may be revoked. *Morrissey v. Brewer*, 408 U.S. 471, 489 (1972). Offenders do not, however, have a clearly established right to unsupervised release in the community and the right to remain released indefinitely while violating a condition of release. The DOC has broad

discretion to impose conditions of release and place offenders on ISR.   Minn. Stat. §§ 244.05, subd. 6 (2008); *State v. Kachina*, 744 N.W.2d 407, 408–09 (Minn. Ct. App. 2008); *State v. Schwartz*, 615 N.W.2d 85, 90 (Minn. Ct. App. 2000), *aff'd* 628 N.W.2d 134, 140–41 (Minn. 2001);.   When state law places no substantive limits on a government decisionmaker's discretion, the law does not create a liberty interest.   *Nativi-Gomez v. Ashcroft*, 344 F.3d 805, 809 (8th Cir. 2003).

In cases decided both before and after Marlowe's SRD, the Minnesota Court of Appeals has repeatedly held that the DOC does not have an obligation to find housing for offenders, that the DOC may transport an offender to a county jail if he has no residence on his SRD, and that the DOC may revoke an offender's release based on a lack of housing.   *State ex rel. Bottomley v. Fabian*, No. A10-652, 2010 WL 2363882, at *2 (Minn. Ct. App. June 15, 2010); *Aguilera v. Fabian*, No. A10-393, 2010 WL 1851349, at *3 (Minn. Ct. App. May 11, 2010); *Truelson v. Fabian*, No. A08-137, 2008 WL 933543, at *3 (Minn. Ct. App. Apr. 8, 2008); *State ex rel. Johnson*, No. A05-88, 2005 WL 704302, at *2 (Minn. Ct. App. Mar. 29, 2005).   The court has rejected the argument that the DOC cannot revoke release if the offender's violation is unintentional. *Bottomley*, 2010 WL 2363882, at *3–4.   Although these decisions are unpublished state court decisions and are therefore not binding for purposes of federal constitutional precedent, the cases are relevant to assessing whether the defendants were plainly incompetent or knowingly violated the law.   *See City of St. Paul v. Eldredge*, 788 N.W.2d 522, 526–27 (Minn. Ct. App. 2010) (recognizing that court's unpublished decisions are not binding but may be persuasive).

Marlowe does not allege that the approved-residence condition was inappropriate given his offense and level-II status. Nor does he challenge the DOC's policy requiring that level-II offenders be on ISR. To the extent that Marlowe disagrees with his level-II designation, he failed to appeal that designation. Guinn Fink Aff. ¶ 4; *see also* Minn. Stat. §§ 14.63, 244.052, subd. 6 (2008) (providing that risk-level designation is subject to contested-case proceedings pursuant to Minn. Stat. ch. 14 and providing right to seek judicial review of final agency decision). He appears to challenge only that he was transported to a county jail on his SRD and that his release was later revoked. The state district court reviewing Marlowe's habeas petition denied his petition. In Marlowe's habeas appeal, the court did not hold that the DOC violated any of Marlowe's constitutional rights, or direct the DOC to release him. *Marlowe*, 755 N.W.2d at 794–97. Given the numerous decisions specifically addressing the DOC, predatory offenders, and housing, Marlowe cannot demonstrate that his transport to the county jail and his subsequent revocation of release violated a clearly established right.

Throughout Marlowe's habeas proceedings, DOC staff continued to help Marlowe find housing; he was eventually placed on a waiting list and released when a bed became available. Through his attorney, Marlowe agreed that placing him on a waiting list in the fall of 2008 was appropriate; he therefore cannot assert that his incarceration from the date of the court of appeals decision to his rerelease violated clearly established rights. Because Marlowe cannot establish that Fabian or Peterson violated a clearly established right, qualified immunity bars his individual-capacity claims.

VII.   **MARLOWE CANNOT ESTABLISH THAT THE DEFENDANTS VIOLATED ANY OF HIS CONSTITUTIONAL RIGHTS.**

Marlowe alleges that the defendants violated his Fourth, Fifth, Eighth, and Fourteenth Amendment rights.  Even if Marlowe could establish that insufficient personal involvement and qualified immunity do not bar his Section 1983 claims, summary judgment is still appropriate because Marlowe cannot establish any constitutional violations.  Marlowe received due process, and he was not subject to an improper seizure or cruel and unusual punishment.

A.   **MARLOWE CANNOT ESTABLISH ANY DUE-PROCESS VIOLATIONS.**

Marlowe asserts violations of the Fifth and Fourteenth Amendment due process clauses.  The Fifth Amendment due process clause, however, applies only to acts by the federal government.  *Warren v. Gov't Nat'l Mortg. Ass'n*, 611 F.2d 1229, 1232 (8th Cir. 1980); *Underdahl v. Minnesota*, No. 09-1843 (PAM/RLE), 2010 WL 2301328, at *13 n.9 (D. Minn. May 3, 2010).  As to Marlowe's Fourteenth Amendment claim, he does not indicate whether he is alleging a violation of his procedural or substantive due process rights.  Under either analysis, summary judgment is appropriate.  Marlowe received any procedural process he was due, and he cannot establish infringement of a fundamental right.

1.   **Marlowe Cannot Establish A Procedural-Due-Process Violation.**

To establish a procedural-due-process violation, a plaintiff must establish that he has a protected liberty or property interest and that the government lacked a procedure to adequately protect this interest.  *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564,

569-70 (1972).   Because process itself is not an end, a party asserting a due process violation must first show he has a legitimate claim of entitlement.  *Dist. Attorney's Office for the Third Judicial Dist. v. Osborne*, 129 S. Ct. 2308, 2319 (2009); *Greenholtz v. Inmates of Neb. Penal & Corr. Complex*, 442 U.S. 1, 7 (1979).   A liberty interest must derive from the federal constitution or state law or policies.  *Wilkinson v. Austin*, 545 U.S. 209, 221 (2005).   An offender's abstract need or desire for, or unilateral expectation of, a right is insufficient to create a liberty interest.  *Greenholtz*, 442 U.S. at 7.   An inmate has no legitimate expectation when the law does not substantively limit a government decisionmaker's discretion.   *Nativi-Gomez*, 344 F.3d at 809 ("However broadly and amorphously the concept of constitutionally protected liberty interests has been defined within procedural-due-process jurisprudence, it does not include statutorily created relief that is subject to the unfettered discretion of a governmental authority.").

Marlowe bases his due-process claim on the revocation of his release and on the defendants' alleged failure to release him "after acknowledging that he had not violated his conditions of his release."  Compl. ¶¶ 21–22.   The defendants interpret the latter quotation to refer to Marlowe's contention that he did not intentionally violate the conditions of his release.  Because Marlowe was released on his SRD and he was not in compliance with the conditions of his release, the DOC appropriately revoked Marlowe's release.  Marlowe cannot establish any violation of his procedural due process rights.

### a.     The DOC released Marlowe on his SRD.

As previously noted, a Minnesota offender has a liberty interest in his SRD. *Carrillo*, 701 N.W.2d at 772.   That an offender has a liberty interest in his SRD, however,

does mean that an offender has a right to an unconditional release. The DOC did not interfere with Marlowe's liberty interest in his SRD because he was released on his SRD in accordance with Minn. Stat. § 244.05, subd. 1. Marlowe appears to allege that he was never released from prison because his ISR agent picked him up from prison and eventually transported him to jail. Federal courts are bound by a state court's interpretation of a state statute. *Johnson v. United States*, 130 S. Ct. 1265, 1269 (2010). As previously noted, the Minnesota Court of Appeals has repeatedly held that an offender is "released" within the meaning of Minn. Stat. § 244.05 when he physically leaves a correctional facility on his SRD. *Bottomley*, 2010 WL 2363882, at *2–4. Marlowe physically left MCF–RC on his SRD. Marlowe Dep. Tr. 31; Ruben Aff. ¶ 15. He therefore cannot establish any due-process violations based on an alleged failure to release him.

> **b.    Marlowe received due process before the DOC revoked his release.**

Marlowe cannot establish a procedural-due-process violation based on the revocation of his release. The Minnesota legislature has specifically permitted the Commissioner to impose conditions of release. Minn. Stat. § 244.05, subd. 6. Residing at an approved residence protects public safety and enables the DOC to implement conditions of release and effectively supervise offenders. Although an offender is responsible for finding his own housing, Marlowe relied primarily on DOC staff to find him housing. Marlowe Dep. Tr. 30–31; Behrens Aff. ¶ 4, Ex. 3, No. 4. Despite his allegation that he was willing to live anywhere in the state, Marlowe looked for housing

only in the Twin Cities metropolitan area.   Compl. ¶ 15; Marlowe Dep. Tr. 71.   He opposed living in a potential Chisago County placement.   Tardy Aff. ¶ 14.   Similarly, despite his allegation of having "very limited" contact with his MCF–LL case manager, he had frequent contact with her.   Compl. ¶ 12; Tardy Aff. ¶ 7; Marlowe Dep. Tr. 69–70.

Marlowe sexually assaulted his minor daughter, and this conduct limited his housing options.   The defendants cannot be held liable, however, for private landlords and citizens' unwillingness to provide Marlowe with housing.   Nor can Marlowe point to any legitimate expectation that the state would provide him housing.   At best, Marlowe could argue that the DOC staff should have utilized the dispute-resolution process earlier. But the failure to follow a policy is not unconstitutional.   *Rivera v. Illinois*, 129 S. Ct. 1446, 1455 (2009) ("[E]rrors of state law do not automatically become violations of due process.").

Marlowe received due process before the DOC revoked his release.   Due process in the parole-revocation context requires written notice of the claimed parole violations; disclosure of the evidence; an opportunity to be heard and to submit evidence; the right to confront and cross-examine adverse witnesses absent good cause for disallowing confrontation; a neutral decisionmaker; and a written decision detailing the evidentiary basis for the decision and the reason for revocation.   *Morrissey*, 408 U.S. at 489. Minnesota law does not prohibit the DOC from revoking release when an offender's noncompliance with the conditions of his release is unintentional. *Bottomley*, 2010 WL 236388, at *3–4.

Marlowe received due process before the DOC revoked his release. Before Marlowe's release was revoked, he received notice of his violation and the evidence against him; he had an opportunity to submit evidence and confront witnesses; and he received a written decision from a neutral decisionmaker. Marlowe does not allege that any component of due process was lacking. Compl. Regardless of whether Marlowe was intentionally or unintentionally noncompliant with the conditions of his release, he was not in compliance with the conditions of his release on December 18, 2007, the date of his revocation. He does not allege that the DOC revoked his revocation despite residing in approved housing. While Marlowe may disagree with the outcome of his revocation hearing, he cannot establish that the state denied him due process.

### 2. Marlowe Cannot Establish A Substantive-Due-Process Violation.

Substantive due process is a theory "properly reserved for truly egregious and extraordinary cases" because liability "turns on the government official's evil intent." *Mills v. City of Grand Forks*, 614 F.3d 495, 498 (8th Cir. 2010) (quotation omitted); *Sitzes v. City of West Memphis Ark.*, 606 F.3d 461, 467 (8th Cir. 2010). To establish a substantive-due-process violation, the plaintiff must demonstrate that government action deprived him of a fundamental right and that a government official acted in a manner that shocks the conscience. *Washington v. Glucksberg*, 521 U.S. 702, 720–21 (1997); *Bandy-Bey v. Crist*, 578 F.3d 763, 767 (8th Cir. 2009). Marlowe cannot establish either aspect of a substantive-due-process claim.

Marlowe cannot establish infringement of a fundamental right. A fundamental right is one that is "deeply rooted in this Nation's history and tradition, and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if they were sacrificed." *Norris v. Engles*, 494 F.3d 634, 638 (8th Cir. 2007) (quotation omitted). In contrast to the procedural-due-process context, in which state law may create a liberty interest, a right entitled to substantive-due-process protection is created only by the U.S. Constitution. *Regents of Univ. of Mich. v. Ewing*, 474 U.S. 214, 229 (1985) (Powell, J., concurring). Fundamental rights are limited; courts are reluctant "to expand the concept of substantive due process because guideposts for responsible decisionmaking in this uncharted area are scarce and open-ended." *Osborne*, 129 S. Ct. 2308, 2322 (2009) (quotation omitted). When claiming a substantive-due-process violation, the plaintiff must describe the claimed right with specificity and avoid overgeneralization. *Glucksberg*, 521 U.S. at 721–23. In a case before the U.S. Court of Appeals for the Fourth Circuit, for example, the court noted that attempts to frame a fundamental right of "freedom from unjust incarceration" and the "right to be free from arbitrary incarceration" were "issue-begging generalizations that cannot serve the [fundamental-right] inquiry." *Hawkins v. Freeman*, 195 F.3d 732, 747 (4th Cir. 1999). When another constitutional amendment provides an explicit source of constitutional protection, courts should analyze the claim under the specific amendment rather than the umbrella of substantive due process. *Albright v. Oliver*, 510 U.S. 266, 273 (1997).

Marlowe's complaint does not identify a claimed fundamental right; he alludes only to unlawful incarceration. Compl. ¶ 17. Without a specific statement of a protected

right arising from the Constitution and deeply rooted in the country's history and tradition, Marlowe cannot establish a substantive-due-process violation.  Marlowe has no federal constitutional fundamental right to supervised release or to remain on release without appropriate conditions.  *See Greenholtz*, 442 U.S. at 7 (recognizing that inmates have no constitutional right to parole). To the extent Marlowe is challenging protection of his state-created liberty interest in supervised release, this challenge does not fall within the purview of substantive due process.  To the extent that Marlowe is challenging his transport to jail and his revocation of release, the procedural due process clause and the Fourth Amendment provide more specific bases for analyzing those claims.

Even if Marlowe could establish a fundamental right, Marlowe cannot establish any government action that shocks the conscience.  Establishing a substantive-due-process violation requires more than an assertion that government action is arbitrary, capricious, or violative of state law.  *Mills*, 614 F.3d at 498.  Marlowe cannot meet this high standard.

Marlowe's intentional criminal sexual conduct limited his freedom; he went to prison and, although he had a right to eventually be released, his release was conditional. The DOC reasonably required Marlowe, a level-II predatory offender, to reside at a location that was both conducive to supervision and protected public safety.  Marlowe did not locate a permanent residence before his SRD.  He instead focused on living in transitional housing in Ramsey County, a county in which he did not have a recent residential tie.  Given those factors, Ramsey County refused to supervise Marlowe at a Ramsey County halfway house.  The DOC does not have the resources to supervise ISR

offenders in CCA counties.   DOC staff persistently helped Marlowe look for either a permanent residence in any county or transitional housing in his county of commitment. Marlowe was nonetheless released on his SRD.   Because of the DOC's obligations to public safety, Marlowe's level-II status, and the dictates of ISR supervision, the DOC did not permit Marlowe to simply live on the streets unsupervised.   The DOC instead transported Marlowe to a county jail, not to continue his term of imprisonment, but to implement ISR in the absence of other housing.   *See Johnson*, 2005 WL 704302, at *2 (upholding practice).   The entire time Marlowe was in prison or jail after his SRD, he would have been released at any time he located approved housing.   When Ramsey County eventually agreed to supervise Marlowe and a bed in the county was available, the DOC released him.   Throughout this process, DOC staff continued to help him look for housing and Marlowe received privileges he ordinarily would not have received, such as getting extra time with his case manager, moving to a different living unit, and getting to live in a CCA county supervised by county staff despite having no permanent residence in the county.   Ruben Aff. ¶ 10; Tardy Aff. ¶ 8; Nelson Aff. ¶ 7.   Nothing about these events shocks the conscience or indicates an evil intent by government actors. Rather, the events reflect a concerted effort to help Marlowe within the bounds of state law, and DOC and county policies.   Marlowe cannot establish a substantive-due-process violation.

### B.   MARLOWE CANNOT ESTABLISH A FOURTH AMENDMENT VIOLATION.

To sustain a Fourth Amendment claim under Section 1983, a plaintiff must establish an arrest by a state officer that was unauthorized by state law.   *Cole v. Neb.*

*State Bd. of Pardons*, 997 F.2d 442, 444 (8th Cir. 1993). If an officer had good-faith and probable cause, the claim must fail. *Washington v. Simpson*, 806 F.2d 192, 195–96 (8th Cir. 1986). Similarly, a seizure based on probable cause would not result in liability if a suspect is later found innocent. *Hannah v. City of Overland, Mo.*, 795 F.2d 1385, 1389 (8th Cir. 1986). Probable cause is based on the totality of the circumstances before a reasonably cautious state officer at the time of the seizure. *Id.* Probable cause requires a mere probability of unlawful activity. *Id.* Establishing probable cause in the context of a parole violation requires only a reasonable factual basis for determining that an offender violated a condition of his release. *Morrissey*, 408 U.S. at 486; *Larson v. Fabian*, No. A05-1355, 2006 WL 1320474, at *2–3 (Minn. Ct. App. May 16, 2006).

The factual basis for Marlowe's Fourth Amendment claim is unclear, but it appears to be based on his transport to jail on his SRD or the revocation of his release. As to his transport, an offender on release is always in the DOC's legal custody, subject to be returned to a DOC facility at any time. Minn. Stat. § 243.05, subd. 1(b) (2008). Minnesota law requires a supervising agent to transport released offenders from prison to a halfway house or residential program. *Id.* § 244.05, subd. 1c (2008). Pursuant to the legislative discretion to administer the ISR program, the DOC further requires agents to transport any ISR offender from prison to his initial placement. DOC Policy 201.023, § C; *see also* Minn. Stat. § 244.05, subd. 6 (granting discretion to administer ISR program). Marlowe was on ISR. His agent therefore had a reasonable basis for picking him up from prison on his SRD.

Marlowe's transport to the county jail was also supported by probable cause. An order of the Commissioner is a sufficient basis, even absent a warrant, for any supervising agent to place an offender in physical custody. *Id.*, subd. 1(c). The Commissioner has delegated to HRU authorization to issue warrants. *See* Minn. Stat. § 243.05, subd. 4 (2008) (authorizing Commissioner to delegate duties conferred by Section 243.05 to the HRU); Minn. R. 2940.0400(E) (2009) (authorizing HRU to issue warrants). Marlowe's conditions of release required him to live in an approved residence. As of his SRD, to the agent's knowledge, Marlowe did not have a residence. In his agent's presence, Marlowe called two people and was unsuccessful in securing a residence. Terwey Aff. ¶ 8. The agent therefore had probable cause to believe that Marlowe was in violation of the conditions of his release. HRU issued a warrant to detain Marlowe in the county jail. *Id.*, Ex. 2. Marlowe would have been released from jail at any time if he found housing. The agent's actions were supported by an objectively reasonable belief that Marlowe had nowhere to live and was in violation of his conditional release. Because Marlowe had no right to be homeless on ISR, the agent obtained a warrant and transported Marlowe to jail. Marlowe was then incarcerated at MCF–LL pursuant to the revocation of his release. Probable cause supported Marlowe's detention.

### C.   MARLOWE DID NOT RECEIVE ANY CRUEL OR UNUSUAL PUNISHMENT.

The Eighth Amendment prohibits cruel and unusual punishment. U.S. Const. amend. VIII. Eighth Amendment challenges typically involve a challenge either to a court-imposed sentence or to a condition of confinement. Establishing an Eighth

Amendment violation based on sentence proportionality requires evidence that a criminal sentence is "grossly disproportionate to the offense." *United States v. Lee*, ___ F.3d ___, 2010 WL 4340983, at *5 (8th Cir. 2010).  Absent the death penalty, a sentence will rarely violate the Eighth Amendment.  *Id.*  To establish an Eighth Amendment violation based on a condition of confinement, a plaintiff must establish that the defendant was deliberately indifferent to a substantial risk to the offender's health or safety.  *Farmer v. Brennan,* 511 U.S. 825, 833–34, 837 (1994); *Estelle v. Gamble*, 429 U.S. 97, 104–05 (1976).  A plaintiff fails to state an Eighth Amendment claim when a prison official's conduct does not "create inhumane prison conditions, deprive inmates of basic necessities, . . . fail to protect their health or safety [or] involve the infliction of pain or injury, or deliberate indifference to the risk that it might occur," a plaintiff fails to state an Eighth Amendment claim.  *Overton v. Bazzetta*, 539 U.S. 126, 137 (2003).

Marlowe alleges that the defendants violated his Eighth Amendment rights by "repeatedly increasing [Marlowe's] term of imprisonment when he had done nothing to justify such punishment."  Compl. ¶¶ 26–27.  He therefore appears to challenge the fact of his confinement, but not as it relates to his court-imposed sentence.  To the extent Marlowe believes it is cruel and unusual punishment to be subject to prison and supervised release, the proper challenge would have been to appeal his sentence.  Marlowe's use of the phrase "term of imprisonment" in his allegations also indicates that his Eighth Amendment argument is predicated on his argument that he was never released on his SRD.  As already established, Marlowe was released from prison in accordance with state law on his SRD.  If Marlowe believes revocation of his release was

cruel and unusual, his argument his misplaced.  A revocation of a Minnesota offender's supervised release is reviewed only for an abuse of discretion.  *State ex rel. Guth v. Fabian*, 716 N.W.2d 23, 27 (Minn. Ct. App. 2006).  Although Marlowe's release was revoked, he would have been released at any time he found approved housing.  His incarceration was within the bounds of his criminal sentence.  He therefore lacks a factual basis for asserting that he was subject to repeatedly increasing sanctions.

Standing alone, incarceration is not inherently cruel and unusual.  Marlowe does not allege that, while incarcerated, he was subject to any inhumane conditions of confinement, that he was deprived of any basic necessities, that either defendant failed to protect him, or that either defendant was deliberately indifferent to a substantial risk to his health or safety.  Marlowe therefore cannot establish an Eighth Amendment violation.

## VII.   MARLOWE CANNOT ESTABLISH ANY LIABILITY UNDER STATE LAW.

Marlowe alleges that the defendants violated state law by falsely imprisoning him, and he seeks damages.  The Court may decline to exercise supplemental jurisdiction over Marlowe's state law claims. *See* 28 U.S.C. § 1367(c)(3) (2006) (providing that court may decline supplemental jurisdiction if it dismisses all claims that gave court original jurisdiction).  Even if the Court considers the claim, summary judgment is appropriate.  Immunity bars his claims, and Marlowe cannot establish that the defendants committed any torts.

A.    **Immunity Prohibits Marlowe's Claims For The Defendants' Discretionary Acts.**

In the absence of willful or malicious acts, official immunity provides immunity to public officials whose duties require them to exercise discretion. *Johnson v. Morris*, 453 N.W.2d 31, 42 (Minn. 1990). When a public official is immune from suit, the official's employer receives vicarious official immunity from suit. *Schroeder v. St. Louis County*, 708 N.W.2d 497, 508 (Minn. 2006). Immunity applies even if a public official abused his discretion. Minn. Stat. § 3.736, subd. 3(b) (2008).

DOC staff have significant discretion in determining appropriate conditions of release. *Schwartz*, 615 N.W.2d at 90; *State v. Kachina*, 744 N.W.2d at 408–09. Similarly, revocation decisions are reviewed for an abuse of discretion. *Guth*, 716 N.W.2d at 27. Because Marlowe was released on his SRD and the conditions of his release and subsequent revocation were discretionary, official and vicarious official immunity bar his tort claim. Similarly, to the extent Marlowe's alleges false imprisonment based on the DOC's inability to supervise him in any county, the Commissioner has broad discretion to determine how to distribute the DOC's staff and resources. Minn. Stat. § 241.01, subd. 3a(g) (2008). Official and vicarious official immunity therefore also bar this claim.

B.    **Marlowe Cannot Establish He Was Falsely Imprisoned.**

A plaintiff cannot sustain a claim for false imprisonment if his confinement was supported by probable cause. *Johnson*, 453 N.W.2d at 36. Probable cause in the context

of a parole violation requires only a reasonable basis to believe that the offender violated a condition of his release.  *Larson*, 2006 WL 1320474, at *2–3.

As addressed in response to Marlowe's Fourth Amendment claim, the DOC had probable cause to take Marlowe to the county jail.  The DOC further had a lawful basis for revoking his release when he failed to find housing before his revocation hearing.  Marlowe therefore cannot maintain a false-imprisonment claim.

## CONCLUSION

Because Marlowe cannot obtain any of the relief requested in his complaint, nor can he establish that he is entitled to any relief, the defendants respectfully request that the Court enter summary judgment in their favor.

Dated:  December 3, 2010

Respectfully submitted,

LORI SWANSON
Attorney General
State of Minnesota

s/ **Angela Behrens**
Angela Behrens
Assistant Attorney General
Atty. Reg. No. 0351076

445 Minnesota Street, Suite 900
St. Paul, MN 55101-2127
Telephone:  (651) 757-1204
Fax:  (651) 297-4139
angela.behrens@state.mn.us

ATTORNEYS FOR DEFENDANTS

AG: #2708493-v1